# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK MADDEN, individually and on behalf of all others similarly situated, | CASE NO. _____ |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v | |
| MARSHALL W. PAGON, JOSEPH W. POOLER, JR. and PEGASUS COMMUNICATIONS CORPORATION, | CLASS ACTION |
| Defendants. | JURY TRIAL DEMANDED |

Plaintiff, by his counsel, for this Class Action Complaint hereby alleges the following upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters, based upon an investigation by his counsel, including, among other sources, a review of publicly filed court documents and news releases of Defendant Pegasus Communications Corporation ("Pegasus" or the "Company"), and a review of relevant public filings made by Pegasus and its wholly-owned subsidiary Pegasus Satellite Communications, Inc. ("PSC") with the Securities and Exchange Commission (the "SEC").

## Introduction and Overview

1.     This is a class action brought on behalf of those persons (the "Class") who acquired the common stock of Pegasus during the period from November 10, 2000 through June 2, 2004 (the "Class Period"). Plaintiffs allege violations against all defendants of Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the SEC.

2.      The public filings and business publications of Pegasus claimed that PSC had exclusive distribution rights for DirectTV satellite television programming services within defined territories across 41 states. Such rights were the centerpiece of PSC's business plan.

3.      The description of PSC's exclusive distribution rights were unqualified and unequivocal but specifically disclosed that such rights could be terminated prematurely for cause in the event that a party breached the exclusive distribution agreement.

4.      Pegasus failed to disclose that such exclusive distribution rights could be terminated prematurely without cause and without the authorization and consent of PSC as early as 2004. Thus a substantial risk going to the heart of PSC's business and went undisclosed.

5.      In reliance on such statements and omissions from November 10, 2000 until June 2, 2004, Plaintiff and the Class purchased Pegasus securities. Unbeknownst to Plaintiff and the Class, the statements of Pegasus regarding PSC's exclusive distribution rights were materially misleading. On June 2, 2004, Pegasus and PSC announced that PSC's exclusive rights to distribute DirectTV services had been terminated without cause. The termination of exclusivity was so devastating to PSC that on the same day it filed a voluntary petition for bankruptcy. Consequently, the securities purchased by Plaintiff and the Class during the Class Period plummeted in value, causing millions of dollars in damages to investors.

## JURISDICTION AND VENUE

6.      This action arises under Sections 10(b) and 20 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

7.      The Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

2

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C.

§ 1391(b).  Many of the wrongs alleged in this complaint occurred in substantial part in this

District, including the preparation and dissemination of materially false and misleading

statements to the investing public.  Pegasus maintains its principal places of business in this

district in Bala Cynwyd, Pennsylvania.

9.      In connection with the acts, transactions and conduct alleged herein, Defendants, directly

and indirectly, used the means and instrumentalities of interstate commerce, including the United

States mails, interstate telephone communications and the facilities of national securities

exchanges and markets.

## THE PARTIES

10.     Plaintiff Mark Madden purchased shares of Pegasus stock during the Class Period and

was damaged thereby. His certification is attached to the Complaint.

11.     Defendant Pegasus is a Delaware corporation with its principle place of business in Bala

Cynwyd, Pennsylvania. At all material times, its principle assets consisted of the stock of its

wholly owned subsidiary PSC, and its principal operating business was the distribution of

DirecTV programming. Pegasus is a controlling person of PSC.

12.     Defendant Marshall W. Pagon ("Pagon") is an individual who, upon information and

belief, resides in Haveford, Pennsylvania. Pagon serves, and has served at all relevant times, as

Chairman and Chief Executive Officer of Pegasus and PSC. Pagon effectively controls Pegasus

by virtue of his ownership of all shares of Pegasus Class B common stock by intermediate

affiliates controlled by Pagon. Pagon also controlled PSC insofar as Pegasus owned all of PSC's

outstanding shares. Pagon signed the 2001, 2002 and 2003 Form 10-K'sand 10-Qs for Pegasus

and PSC, filed on or about April 2, 2001, April 15, 2002. March 30, 2003 and March 15, 2004,

respectively.  Pagon also signed the certifications required under the Sections 906 and 301 of the

Sarbanes-Oxley Act ("SOA") in his capacity as CEO for each quarterly and annual period since

the enactment of SOA in July 2002.

13.      Defendant Joseph W. Pooler, Jr. ("Pooler") is an individual who, upon information and

belief, resides in Philadelphia, Pennsylvania. Pooler served as Chief Financial Officer of Pegasus

until June 8, 2005 and served as Senior Vice President of Finance from February 2003 to January

2004. Pooler also served as Pegasus' Vice President of Finance and Controller from January

2001 until February 2003. Pooler served as Vice President and Controller of PSC from

December 1999 through January 2001. Pooler was a controlling person of both Pegasus and

PSC. Pooler signed the 2002 and 2003 Form 10-K's for Pegasus and PSC as senior vice

president of each company.

14.      Defendant M. Kasin Smith ("Smith") is an individual who, upon information and belief,

resides in Philadelphia, Pennsylvania. Vice President and Chief Financial Officer, and as

Principal Financial and Accounting Officer from 1998 through June 2005. Smith also served as

Chief Financial Officer, Treasurer and Executive Vice President of Finance and Information

Technology of PSC during the Class Period.  Smith was a controlling person of both Pegasus and

PSC. Smith signed the 2001, 2002 and 2003 Form 10-K's for Pegasus and PSC as vice president

and CFO of each company.

15.      Pagon, Smith and Pooler are referred to herein as the "Individual Defendants."  Because

of the Individual Defendants' positions with the Company, they had access to the adverse

undisclosed information about the Company's business, operations, via access to internal

corporate documents (including the DBS agreement and related agreements in question),

conversations and connections with other corporate officers and employees, and attorneys,

4

attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

16.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Pegasus, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, and operations as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

17.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ market, and governed by the provisions of the federal securities laws, the defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's business condition and operations, as well as, present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions there from, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Pegasus, each of the defendants had access to the adverse, undisclosed information about Pegasus's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Pegasus and its business issued or adopted by the Company materially false and misleading.

19.    Non-Party PSC is a wholly owned subsidiary of Pegasus through which Pegasus conducted its direct broadcast satellite television businesses. Unlike its parent, Pegasus, the shares of PSC were not publicly traded; however, PSC filed Form 10-K reports pursuant to the Securities and Exchange Act of 1934. PSC held itself out as "the largest independent distributor of DirecTV programming with in excess of 1.1 million subscribers at December 31, 2003 with the exclusive right to distribute DirecTV services to approximately 8.4 million rural households in specified territories within 41 states." On June 2, 2004, after its exclusive distribution rights were terminated, PSC filed a petition for protection under Chapter 11 of the United States Bankruptcy Court for the District of Maine.

20.    Non-party National Rural Telecommunications Cooperative ("NRTC") is a member owned, member controlled organization. NRTC's members consist of approximately nine hundred rural electric cooperatives and telephone utilities located in forty-eight states serving 30 million rural Americans. NRTC, pursuant to the DBS Agreement with DirecTV, offered its

6

members television programming and other services provided by DirecTV. Members sold and

distributed DBS services to subscribers in their territories entering into separate Subscriber

Agreements for this purpose. PSC was far and away the largest member of NRTC.

21.     Non-party DirecTV is a company that provides direct broadcast satellite services.

DirecTV, through two broadcast centers in the United States, transmits digitally compressed

programming to satellites which beam programming and information directly to miniature

satellite dishes installed in homes and businesses across the United States.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure

23(a) and (b)(3) on behalf of the Class defined above.  Excluded from the Class are the

Defendants, members of the immediate family of each of the Individual Defendants, Pegasus,

any subsidiary or affiliate of Pegasus or any of their subsidiaries or affiliates, or any entity in

which any excluded person has a controlling interest, as well as the legal representatives, heirs,

successors and assigns of any excluded person.

23.     While the exact number of Class members is unknown and can only be ascertained

through appropriate discovery, Plaintiff believes there are thousands of them.  Joinder of all

Class members is impracticable.  Furthermore, because the damages suffered by the individual

Class members may be relatively small, the expense and burden of individual litigation make it

impossible for the Class members individually to redress the wrongs done to them.

24.     Common questions of law and fact exist as to all members of the Class and predominate

over any questions affecting solely individual members.  Among the questions of law and fact

common to the Class are:

> a)     whether the federal securities laws were violated by Defendants' acts as
> alleged herein;

7

      b)      whether the Individual Defendants are "control persons" within the meaning of the federal securities laws;

      c)      whether Pegasus and the Individual Defendants omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading during the Class Period;

      d)      whether the market prices of Pegasus securities during the Class Period were artificially inflated as a result of the conduct alleged in this complaint; and

      e)      whether Plaintiff and the other members of the Class have sustained damages and, if so, the proper measure of those damages.

25.     Plaintiff's claims are typical of the claims of other Class members. Plaintiff and the other Class members sustained damages arising out of Defendants' wrongful conduct.

26.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

27.     Few members of the class have an interest in individually controlling a separate action with similar allegations and claims; no litigation with the allegations herein contained is currently on file; it is desirable to concentrate the litigation of all similar claims to Plaintiff's in this jurisdiction; and no difficulties are likely to be encountered in the management of a class action. A class action, therefore, is superior to other available methods for the fair and efficient adjudication of Plaintiff's claims.

28.     Pursuant to Fed. R. Civ. P. 23(g), counsel for Plaintiff will fairly and adequately represent the interests of the class. Counsel has investigated the claims set forth in this complaint, are experienced in class actions, in particular those alleging violations of the federal

securities laws, will commit the necessary resources to prosecuting the case effectively, and are knowledgeable about the law under which they assert claims on Plaintiff's behalf.

29.     The names and addresses of purchasers of Pegasus stock are available from Pegasus' transfer agent.  Notice can be provided to such record owners via first class mail using technique and form of notice similar to those customarily used in class actions.

## FACTUAL BACKGROUND

30.     On April 10, 1992, NRTC and DirecTV entered into an agreement, the Direct Broadcasting Satellite Distribution Agreement ("the DBS Agreement"), whereby DirecTV agreed to provide NRTC with certain exclusive rights to distribute DirecTV's premium programming and services in NRTC's area of service.

31.     Following the execution of the DBS Agreement, NRTC entered into separate "NRTC/Member Agreements for Marketing and Distribution of Direct Broadcast Service" ("Member Agreements") with its members and affiliates, such as PSC, pursuant to which NRTC passed through DirecTV programming and distribution services to its members.

32.     NRTC and PSC entered into a Member Agreement on July 23, 1993. The Member Agreement provides in part, "NRTC grants [PSC] the exclusive right to market and sell DBS Services transmitted over the HCO Frequencies to Committed Member Residents"

33.     At the time DirecTV began providing satellite programming services in 1994, PSC, and its affiliates, were the largest of the original DirecTV independent distributors, with a DirecTV exclusive territory of approximately 500,000 homes in four New England states. In October 1996, PSC began acquiring exclusive distribution rights from other NRTC Patrons. Between October 1996 and February 2001, the companies claimed to have in excess of 1.1 million subscribers and the exclusive right to distribute DirecTV services to approximately 8.4 million

9

rural households in specific territories within 41 states, representing a market penetration of 13% of the rural households in such territories. PSC's DirecTV distribution operations accounted for a substantial majority of the revenue and assets of Pegasus.

## MISLEADING STATEMENTS DURING THE CLASS PERIOD

34.    All of Pegasus' SEC filings, including Form 10-Ks and 10-Qs filed for fiscal years 2001 to 2003, stated without qualification that Pegasus, through, PSC had exclusive distribution rights for DirecTV programming via the DBS Agreement. For example, Pegasus Form 10-Q filed on November 14, 2000 stated:

> At September 30, 2000, we had exclusive DIRECTV distribution rights to 7.4 million households and 1.3 million subscribers compared to 4.8 million households and 630,900 subscribers at September 30, 1999.

35. All of Pegasus' Form 10-Ks filed for fiscal years 2001 to 2003 also described ongoing litigation with DirecTV and NRTC concerning NRTCs and Pegasus' rights under the DBS Agreement.  For example, Pegasus Form 10-Q for the quarter ended September 30, 2000 stated:

> The Company is a rural affiliate of the National Rural Telecommunications Cooperative ("NRTC"). The NRTC is a cooperative organization whose members and affiliates are engaged in the distribution of telecommunications and other services in predominantly rural areas of the United States. The Company's ability to distribute DIRECTV programming services is dependent upon agreements between the NRTC and Hughes Electronics Corporation, DIRECTV's parent, and between the Company and the NRTC.
>
> On September 3, 1999, the NRTC filed a lawsuit in federal court against DIRECTV seeking a court order to enforce the NRTC's contractual rights to obtain from DIRECTV certain premium programming formerly distributed by United States Satellite Broadcasting Company, Inc. for exclusive distribution by the NRTC's members and affiliates in their rural markets. On July 22, 1999, DIRECTV responded to the NRTC's continuing lawsuit by rejecting the NRTC's claims to

exclusive distribution rights and by filing a counterclaim seeking judicial clarification of certain provisions of DIRECTV's contract with the NRTC. *In particular, DIRECTV contends in its counterclaim that the term of DIRECTV's contract with the NRTC is measured solely by the orbital life of DBS-1, the first DIRECTV satellite launched into orbit at the 101(Degree) W orbital location, without regard to the orbital lives of the other DIRECTV satellites at the 101(Degree) W orbital location.* DIRECTV also alleges in its counterclaim that the NRTC's right of first refusal, which is effective at the end of the term of DIRECTV's contract with the NRTC, does not provide for certain programming and other rights comparable to those now provided under the contract. [emphasis added]

36. Thus, Pegasus represented that its exclusive rights to distribute DirecTV programming would last at least as long as the orbital life of the DBS-1 satellite. According to Pegasus, DirecTV had stated that the orbital life of the DBS-1 Satellite extended to at least 2007, based on the amount of fuel remaining.

37. Each of the quarterly Form 10-Qs and annual Form 10-Ks filed by Pegasus and PSC during the Class Period contained substantially the same statements as contained in the Form 10-Q for the quarter ended September 30, 2000 as set forth above.

38. On March 16, 2001 Pegasus filed a Form 8-K with the SEC which stated:

Certain subsidiaries of Pegasus, including Pegasus Satellite Television, Inc. and Golden Sky Systems, Inc., are involved in litigation against DirecTV, Inc. and Hughes Communications Galaxy, Inc. We refer you to Pegasus's annual report on Form 10-K for the year ended December 31, 1999, and subsequent reports on Forms 10-Q and 8-K, for a description of this litigation and of related litigation against DirecTV brought by the National Rural Telecommunications Cooperative and its members.

On Friday, March 9, 2001, DirecTV filed a counterclaim against Pegasus and Golden Sky. In the counterclaim, DirecTV seeks two claims for relief: a declaratory judgment that Pegasus and Golden Sky have no rights of first refusal in their agreements with the National Rural Telecommunications Cooperative to have DirecTV provide them with any services after the expiration of the term of these agreements; and an order that DBS-1 is the satellite (and the only satellite) that measures the term of the Pegasus/Golden Sky agreements. We have been informed by DirecTV that it intends to file a motion for summary judgment on the second of those two claims.

11

39. Pegasus' annual Form 10-K for the year 1999 stated:

Pegasus is ... the largest independent distributor of DirecTV (R), with over 1.4 million subscribers at December 31, 2000, with the exclusive right to distribute DIRECTV digital broadcast satellite services to over 7.5 million rural households in 41 states and a retail network of over 3,500 independent retailers; ...

40. Pegasus 1999 Form 10-K further stated:

Direct Broadcast Satellite Agreements

DirecTV has disputed the extent of the rights held by the participating National Rural Telecommunications Cooperative members and affiliates. See Item 3: Legal Proceedings - DirecTV Litigation. Those disputes include the rights asserted by participating members and affiliates:

o to provide all services offered by DirecTV that are transmitted over 27 frequencies that the FCC has authorized for DirecTV's use for a term running through the life of DirecTV satellites at the 101(degree) W orbital location;

o to provide certain other services over the DirecTV satellites; and

o to have the National Rural Telecommunications Cooperative exercise a right of first refusal to acquire comparable rights in the event that DirecTV elects to launch successor satellites upon the removal of the DirecTV satellites from their orbital location at the end of their lives.

The financial terms of the right of first refusal are likely to be the subject of negotiation and Pegasus is unable to predict whether substantial additional expenditures by the National Rural Telecommunications Cooperative will be required in connection with the exercise of such right of first refusal.

The agreements between the National Rural Telecommunications Cooperative and participating National Rural Telecommunications Cooperative members and affiliates terminate when the DirecTV satellites are removed from their orbital location at the end of their lives. If the satellites are removed earlier than June 2004, the tenth anniversary of the commencement of DirecTV services, Pegasus will receive a prorated refund of its original purchase price for the DirecTV rights. Our agreements with the National Rural Telecommunications Cooperative may also be terminated as follows:

o If the agreement between DirecTV and the National Rural Telecommunications Cooperative is terminated because of a breach by DirecTV, the National Rural Telecommunications Cooperative may terminate its agreements with us, but the National Rural Telecommunications Cooperative will be responsible for paying to us our pro rata portion of any refunds that the National Rural Telecommunications Cooperative receives from DirecTV.

o If we fail to make any payment due to the National Rural Telecommunications Cooperative or otherwise breach a material obligation of our agreements with the National Rural Telecommunications Cooperative, the National Rural Telecommunications Cooperative may terminate our agreement with the National Rural Telecommunications Cooperative in addition to exercising other rights and remedies against us.

o If the National Rural Telecommunications Cooperative's agreement with DirecTV is terminated because of a breach by the National Rural Telecommunications Cooperative, DirecTV is obligated to continue to provide DirecTV services to Pegasus by assuming the National Rural Telecommunications Cooperative's rights and obligations under the National Rural Telecommunications Cooperative's agreement with DIRECTV or under a new agreement containing substantially the same terms and conditions as National Rural Telecommunications Cooperative's agreement with DIRECTV.

41. On or about August 14, 2001 Pegasus filed a Form 10-Q which stated in part:

On June 3, 1999, the NRTC filed a lawsuit in federal court against DIRECTV seeking a court order to enforce the NRTC's contractual rights to obtain from DirecTV certain premium programming formerly distributed by United States Satellite Broadcasting Company, Inc. for exclusive distribution by the NRTC's members and affiliates in their rural markets. On July 22, 1999, DIRECTV responded to the NRTC's continuing lawsuit by rejecting the NRTC's claims to exclusive distribution rights and by filing a counterclaim seeking judicial clarification of certain provisions of DirecTV's contract with the NRTC. In particular, DIRECTV contends in its counterclaim that the term of DirecTV's contract with the NRTC is measured solely by the orbital life of DBS-1, the first DirecTV satellite launched into orbit at the 101(Degree) W orbital location, without regard to the orbital lives of the other DirecTV satellites at the 101(Degree) W orbital location. DirecTV also alleges in its counterclaim that the NRTC's right of first refusal, which is effective at the end of the term of DIRECTV's contract with the NRTC, does not provide for certain programming and other rights comparable to those now provided under the contract.

On August 26, 1999, the NRTC filed a separate lawsuit in federal court against DIRECTV claiming that DIRECTV had failed to provide to the NRTC its share of launch fees and other benefits that DIRECTV and its affiliates have received relating to programming and other services. On September 9, 1999, the NRTC

filed a response to DIRECTV's counterclaim contesting DIRECTV's interpretations of the end of term and right of first refusal provisions.

On January 10, 2000, the Company and GSS filed a lawsuit in federal court against DIRECTV which contains causes of action for various torts, common counts and declaratory relief based on DIRECTV's failure to provide the NRTC with premium programming, thereby preventing the NRTC from providing this programming to the Company and GSS. The claims are also based on DIRECTV's position with respect to launch fees and other benefits, term and rights of first refusal. The complaint seeks monetary damages and a court order regarding the rights of the NRTC and its members and affiliates.

On February 10, 2000, the Company and GSS filed an amended complaint which added new tort claims against DIRECTV for interference with plaintiffs' relationships with manufacturers, distributors and dealers of direct broadcast satellite equipment. The Company and GSS also withdrew the class action allegations to allow a new class action to be filed on behalf of the members and affiliates of the NRTC. The class action was filed on February 27, 2000. All four actions are now pending before the same judge, who has set various hearing dates, including the following. On October 2, 2000, the court will hear argument on the motion for class certification and on DIRECTV's motion to dismiss certain of our claims and claims by the class members. DIRECTV's motion for partial summary judgment on the right of first refusal will be heard on October 30, 2000. The court has set a trial date of November 27, 2001 for all four actions.

42. The August 14, 2001 Form 10-Q also stated:

Pegasus Communications Corporation is:

o The largest independent provider of DIRECTV with approximately 1.2 million subscribers at June 30, 2000, on an actual basis. We have the exclusive right to distribute DIRECTV digital broadcast satellite services to 7.2 million rural households in 41 states. We distribute DIRECTV through the Pegasus retail network, a network in excess of 3,000 independent retailers.

43. Pegasus' Form 10-Q for the period ended September 30, 2001 stated:

At September 30, 2001, we had exclusive DIRECTV distribution rights to approximately 7.5 million households.

44. The quarter ended September 30, 2001 10-Q further repeated the representations concerning the litigation with DirecTV.

45. The Pegasus Form 10-K for the year 2001 filed on April 3, 2002 stated:

> Pegasus Communications is: … the largest independent distributor of DirecTV programming with approximately 1.5 million subscribers at December 31, 2001, the exclusive right to distribute DIRECTV digital broadcast satellite services to approximately 7.5 million rural households in 41 states and a retail network of over 3,000 independent retailers;

46. The Pegasus Form 10-K for the year 2001 filed on April 3, 2002 further stated:

> The agreements between the National Rural Telecommunications Cooperative and participating National Rural Telecommunications Cooperative members and affiliates terminate when the DirecTV satellites are removed from their orbital location at the end of their lives. Our agreements with the National Rural Telecommunications Cooperative may also be terminated as follows:
>
> o If the agreement between DirecTV and the National Rural Telecommunications Cooperative is terminated because of a breach by DirecTV, the National Rural Telecommunications Cooperative may terminate its agreements with us, but the National Rural Telecommunications Cooperative will be responsible for paying to us our pro rata portion of any refunds that the National Rural Telecommunications Cooperative receives from DirecTV.
>
> o If we fail to make any payment due to the National Rural Telecommunications Cooperative or otherwise breach a material obligation of our agreements with the National Rural Telecommunications Cooperative, the National Rural Telecommunications Cooperative may terminate our agreement with the National Rural Telecommunications Cooperative in addition to exercising other rights and remedies against us.
>
> o If the National Rural Telecommunications Cooperative's agreement with DirecTV is terminated because of a breach by the National Rural Telecommunications Cooperative, DirecTV is obligated to continue to provide DIRECTV programming to Pegasus by assuming the National Rural Telecommunications Cooperative's rights and obligations under the National Rural Telecommunications Cooperative's agreement with DirecTV or under a new agreement containing substantially the same terms and conditions as the National Rural Telecommunications Cooperative's agreement with DirecTV.
>
>                                    * * *
>
> Our Ability to Provide DIRECTV Products May Be Limited by the Outcome of Litigation with DirecTV Our ability to offer DIRECTV may be affected by the outcome of litigation between DirecTV and the National Rural Telecommunications Cooperative and between DirecTV and us. DirecTV has filed counterclaims in this litigation in which it is contesting the term of our and

the National Rural Telecommunications Cooperative's agreements. DirecTV is contending that the term of its agreement with the National Rural Telecommunications Cooperative and the National Rural Telecommunications Cooperative's agreement with us is measured only by the orbital life of DBS-1, the first DIRECTV satellite launched, while it is our position that the term is measured by the orbital lives of other DIRECTV satellites at the 101(Degree)W orbital location. In addition, in its counterclaim, DirecTV is also contesting the scope and term of a right of first refusal provided to the National Rural Telecommunications Cooperative in its agreement with DirecTV, and whether we have any right of first refusal in our agreements with the National Rural Telecommunications Cooperative.

47. Pegasus Form 10-Q for quarter ended March 31, 2002 filed on May 15, 2002 contained

substantially the same representations concerning the DBS Agreement.

48. Pegasus Form 10-Q for quarter ended June 30, 2002 filed on August 14, 2002 contained

substantially the same representations concerning the DBS Agreement.

49. Pegasus Form 10-Q for quarter ended September 30, 2002 filed on November 14, 2002

contained substantially the same representations concerning the DBS Agreement.

50. On May 23, 2003, Pegasus filed a Form 8-K with the SEC which stated in part:

> DIRECTV, Inc. is seeking as part of its counterclaim a declaratory judgment that the term of the NRTC's agreement with DIRECTV, Inc. is measured only by the life of DBS-1, the first DIRECTV satellite launched, and not the orbital lives of the other DIRECTV satellites at the 101(degree) W orbital location. If DIRECTV, Inc. were to prevail on its counterclaim, any failure of DBS-1 could have a material adverse effect on our DIRECTV rights. On May 22, 2003, the court issued an order denying DIRECTV, Inc.'s motion for summary judgment relating to the term of the agreement.

> * * *

> DIRECTV, Inc. filed four summary judgment motions on September 11, 2002 against the NRTC, the class members, and PST and GSS on a variety of issues in the case. The motions cover a broad range of claims in the case, including 1) the term of the agreement between the NRTC and DIRECTV, Inc., 2) the right of first refusal as it relates to PST and GSS, 3) the right to distribute the premiums, and 4) damages relating to the premiums, launch fees, and advanced services claims. These motions were argued on May 5, 2003 and decided on May 22, 2003. As a result of these and earlier rulings, the term of the agreement, the content of the right of first refusal, and plaintiffs rights to launch fees and advanced services and to distribute premiums will all be determined at trial. The court dismissed PST's

16

tort and punitive damage claims and certain aspects of PST's unfair business practices claim. The court also ruled that DIRECTV, Inc. has no obligation to provide PST with services after the Member Agreements between PST and NRTC expire, except that the ruling does not affect: (1) obligations NRTC has or may have to PST under the Member Agreements or otherwise; (2) obligations DIRECTV has or may have in the event it steps into the shoes of NRTC as the provider of services to PST; or (3) fiduciary or cooperative obligations to deliver services owed PST by DIRECTV through NRTC.

51. On August 13, 2003, Pegasus filed a Form 8-K with the SEC which described a settlement of the class action litigation between NRTC, DirecTV and class members, with the exception of Pegasus. The 8-K attached two press releases and a term sheet of the settlement. The Pegasus press release, which was also disseminated in the media nationally stated in part:

> DIRECTV, Inc. (NYSE: GMH) today announced that it has entered into a preliminary settlement agreement with the National Rural Telecommunications Cooperative (NRTC) regarding issues that are currently the subject of litigation among DIRECTV, NRTC and a Class of other NRTC DBS participants in Federal Court. While Pegasus is not a party to the proposed settlement, all NRTC DBS participants, including Pegasus, are being offered the opportunity to participate in the proposed settlement.

> The U.S. District Court for the Central District of California will consider the proposed settlement in a hearing in approximately 45 to 60 days to determine whether the agreement is fair to the Class. The proposed settlement is not effective until the completion of the fairness hearing and, if approved by the Court, will only be binding on parties who agree to accept the proposed settlement.

> ***Pegasus' rights, including its exclusive right to distribute DIRECTV programming in its rural territories, cannot be altered, amended or modified by DIRECTV or NRTC without Pegasus' agreement***. Pegasus' claims against DIRECTV, also pending in Federal Court, including claims regarding the length of term, the right to renew on substantially the same terms, premium services and launch fees are not resolved by the proposed settlement. Pegasus' claims will be resolved in Court if Pegasus and DIRECTV do not agree to a bi-lateral settlement. [emphasis added]

52. Also on August 11, 2003 DirecTV issued an announcement that the settlement agreement provides for the exclusive rights held by NRTC and its members to expire when the DBS-1 satellite reaches the later of the end of its useful life or June 30, 2008.

53. The August 11, 2003 announcements caused Pegasus stock to drop by 37.4%.

54. Thus. Pegasus continued to maintain that its exclusive rights to distribute DirecTV programming could not be terminated by DirecTV or NRTC without its consent.

55.The term sheet (attached to the August 13, 2003 8-K) entered into by the settling class members stated in part:

> (b) The last three words of the first sentence of Section 4.06(a) [of the DBS Distribution Agreement] shall be replaced with "Termination Date". The subsequent portion of Section 4.06(a) shall be replaced with a provision that states that unless the Existing DBS Distribution Agreement (as amended hereby) is terminated, is canceled, or expires earlier pursuant to other provisions of the Existing DBS Distribution Agreement (as amended hereby), the term shall continue until the date of termination of the Existing DBS Distribution Agreement, as amended hereby ("Termination Date"), which Termination Date shall be the later to occur of (x) the date on which (i) the remaining fuel on board DBS-1 is less than 6% of the initial fuel mass prior to launch, including reasonable provision for uncertainty in estimation of fuel, or (ii) there are fewer than eight (8) Transponders on DBS-1 capable of meeting the transponder performance specifications of the respective Users or capable of providing Transponder Capacity that meets the Minimum Requirements; or (y) June 30, 2008.

56. Pegasus Form 10-Q for quarter ended September 30, 2003 filed on November 14, 2003 stated:

> The initial term of NRTC's agreement with DIRECTV, Inc. and our agreements with NRTC is not stated according to a period of years, but is based on the lives of a satellite or satellites. We believe that it is governed by the lives of the satellite resources available to DIRECTV, Inc. at the 101 degree west longitude orbital location for delivery of services under those agreements. DIRECTV, Inc. is seeking as part of its counterclaims against the NRTC, and PST (and the class members), declaratory judgments that the initial term of the DIRECTV, Inc.'s agreement with the NRTC, and the NRTC's agreements with PST (as well as the class members) is measured only by the life of DBS-1, the first DIRECTV satellite launched, and not the orbital lives of the other DIRECTV satellites at the 101 degree west orbital location. According to publicly available documents of DIRECTV, Inc., DBS-1 has an estimated fuel life through 2009. If DIRECTV, Inc. were to prevail on its counterclaims, the initial term of our DIRECTV rights would likely be shorter than a term based on other satellite(s) at the 101 degree west longitude orbital location providing us programming services, which we

believe measure(s) the initial term. Moreover, any premature failure of DBS-1 could adversely impact our DIRECTV rights.

During the course of the litigation, DIRECTV, Inc. has twice filed summary judgment motions on the issue of term, both under the agreement between DIRECTV, Inc. and the NRTC, and the agreements between the NRTC and PST (and the class members). The first motion sought a declaration that the satellite described in the agreements between the NRTC and PST (and the class members) is DBS-1. That motion was denied by an order of the court dated October 29, 2001. The second motion sought a declaration that the term of the agreement between the NRTC and DIRECTV, Inc. is measured by DBS-1. That motion was denied by an order of the court dated May 22, 2003.

While the NRTC obtained a right of first refusal to receive certain services after the term of the NRTC's agreement with DIRECTV, Inc., the scope and terms of this right of first refusal are also being disputed as part of DIRECTV, Inc.'s counterclaim. On December 29, 1999, DIRECTV, Inc. filed a motion for partial summary judgment seeking an order that the right of first refusal does not include programming services and is limited to 20 program channels of transponder capacity.

\*\*\*

…The announced settlement among DIRECTV, Inc., the NRTC and the class is conditioned on a satisfactory "fairness hearing" conducted by the Court relating to the class claims. We have filed copies of the proposed settlement with a Form 8-K dated August 11, 2003.

Among other things, the settlement purports to amend the agreement between DIRECTV and the NRTC to: (i) change the expiration date of initial term of that agreement to the later of the date that DBS-1 is removed from its assigned orbital location under certain specified conditions or June 30, 2008; (ii) eliminate the contractually provided rights after term but provide a term extension through either December 31, 2009 or June 30, 2011 at the election of the participating class member and subject to acceptance by the participating class member of certain conditions; (iii) eliminate the contractually provided right to provide the premiums as exclusive distributor and replace it with a right to provide the premiums on an agency basis; (iv) redefine the contractually provided rights to launch fees and advertising revenues; (v) relinquish claims relating to past damages and restitution on account of the premiums, launch fees and advertising revenues; and (vi) accept an agency role for the sale of certain advanced services, including Tivo.

\*\*\*

The estimated useful life that DBS-1 could have for purposes of our DBS rights may be disputed, but according to public documents of DIRECTV, Inc., DBS-1's useful life is currently estimated to expire in 2009. An unfavorable ruling in the litigation that the initial term of our agreements with the NRTC is determined by DBS-1 could lead to a reassessment of the carrying amount of our DBS rights, as the underlying assumptions regarding estimated future cash flows associated with

those rights could change (ignoring any renewal rights or alternatives to generate cash flows from our subscriber base). Likewise, if we are able to, and elect to, participate in the conditional settlement reached among DIRECTV, Inc, the NRTC, and the class and use estimates of future cash flows through June 30, 2011 instead of 2016, we could reassess the carrying amounts of our DBS rights. In the case of an unfavorable litigation result relating to the term of our agreements or participation in the conditional settlement, we currently estimate that we could record an impairment loss with respect to our DBS rights of approximately $425 million to $600 million, and that annual amortization expense for DBS rights could increase by $12 million to $35 million.

57. On February 5, 2004 DirecTV issued a press release announcing that it had terminated all mediation discussions with Pegasus Communications Corp. related to the parties' pending litigation and further stated in part:

> If Pegasus does not elect to participate in the [class action] settlement, DIRECTV believes that its obligations to provide DBS services to the NRTC for sale by Pegasus will end by June 30, 2008, if not sooner.

58. As a result of this announcement, Pegasus stock dropped by one-third. Never had Pegasus previously provided investors any specific date for when their exclusive rights to distribute DirecTV would terminate, notwithstanding that Pegasus was aware but failed to disclose that the useful life of DBS-1 did not extend beyond 2009. Moreover, this press release ominously stated that Pegasus' exclusive rights might very well terminate prior to the June 2008 date.

59. Pegasus' Form 10-K for the year 2003 filed on March 15, 2004 stated:

> We are the largest independent distributor of DirecTV programming with in excess of 1.1 million subscribers at December 31, 2003 with the exclusive right to distribute DirecTV services to approximately 8.4 million rural households in specified territories within 41 states.

> * * *

> The agreements between the NRTC and participating NRTC members and affiliates terminate when the DIRECTV satellites are removed from their orbital location at the end of their lives. Our agreements with the NRTC may also be terminated as follows:

> > o  If the agreement between DIRECTV, Inc. and the NRTC is terminated because of a breach by DIRECTV, Inc., the NRTC may terminate its agreements with us, but the NRTC will be

20

responsible for paying to us our pro rata portion of any
refunds that the NRTC receives from DIRECTV, Inc.

o  If we fail to make any payment due to the NRTC or otherwise
breach a material obligation of our agreements with the NRTC,
the NRTC may terminate our agreement with the NRTC in addition
to exercising other rights and remedies against us.

o  If the NRTC's agreement with DIRECTV, Inc. is terminated
because of a breach by the NRTC, DIRECTV, Inc. is obligated to
continue to provide DIRECTV programming to us by assuming the
NRTC's rights and obligations under the NRTC's agreement with
DIRECTV, Inc. or under a new agreement containing
substantially the same terms and conditions as the NRTC's
agreement with DIRECTV, Inc.

\* \* \*

Our ability to provide DIRECTV services may be limited by adverse
rulings in litigation or by the settlement between DIRECTV, Inc. and the NRTC.

The initial term of our agreements with the NRTC is not stated
according to a period of years, but is based on the lives of a satellite or
satellites. DIRECTV, Inc. has asserted, in litigation and elsewhere, that the
initial term of the NRTC's agreements with Pegasus Satellite Television, Inc.
and Golden Sky Systems, Inc. (together, "Pegasus Satellite Television") is
measured only by the life of DBS-1, the first DIRECTV satellite launched, and
not as we believe by the orbital lives of any other DIRECTV satellite at the
101(degree) west longitude orbital location providing us programming services.
DBS-1 suffered a failure of one of its two satellite control processors in 1998.
Moreover, DBS-1 has an estimated fuel life through 2009 according to public
documents filed by DIRECTV, Inc. with the Securities and Exchange
Commission ("SEC"), although DIRECTV, Inc. has indicated its belief that the
fuel life of DBS-1 for purposes of our direct broadcast satellite rights is 2007. If
DIRECTV, Inc. were to prevail in its position on term, the initial term of our
DIRECTV rights would likely be shorter than a term based on other satellite(s) at
the 101(degree) west longitude orbital location providing us programming
services, which could have a material adverse impact on our DIRECTV rights and
our business.

60.  The Pegasus 2003 Form 10-K filed on March 15, 2004 further stated:

Adjustments to the useful lives of our direct broadcast satellite rights assets have
been and could further be significant to the results of our operations. For example, at
January 1, 2002 we extended the useful lives for the unamortized portion of all of our
direct broadcast satellite rights at that date to end simultaneously in 2016 (see the
discussion on depreciation and amortization in Results of Operations - Comparison of
2002 to 2001 – Direct Broadcast Satellite Business - Other Operating Expenses for
further information). Prior to 2002, each direct broadcast satellite rights asset generally

had an estimated useful life of 10 years from the date that it was obtained. As a result, amortization expense for direct broadcast satellite rights was $110.5 million in 2002 compared to $236.7 million in 2001.

The lives of our direct broadcast satellite rights are subject to litigation, and could change based on the outcome of the litigation. (See ITEM 3. Legal Proceedings - DIRECTV Litigation for information regarding this litigation.) DIRECTV, Inc. has stated in documents filed with the SEC that DBS-1, the first DIRECTV satellite launched, has an estimated fuel life through 2009, although it has also indicated its belief that the fuel life for purposes of our direct broadcast satellite rights is 2007. If DIRECTV, Inc. were to prevail on its counterclaims, the initial term of our DIRECTV rights would likely be shorter than a term based on other satellite(s) at the 101(degree) west longitude orbital location providing us programming services, which we believe measure(s) the initial term. An unfavorable ruling that the initial term of our agreements with the NRTC is determined by DBS-1 could have a material adverse impact on our business and would lead to a reassessment of the carrying amount of our direct broadcast satellite rights, as the underlying assumptions regarding estimated future cash flows associated with those rights could change (ignoring any renewal rights or alternatives to generate cash flows from our
subscriber base). Likewise, the election to participate in the settlement reached among DIRECTV, Inc., the NRTC, and the class could have a material adverse impact on our business and would lead to a reassessment of the carrying amounts of our direct broadcast satellite rights using estimates of future cash flows through June 30, 2011 at the latest instead of 2016.

**Pegasus SEC Filings Omitted to State Material Facts**

61. All of Pegasus' Form 10-Ks and 10-Qs during the Class Period were replete with references to PSC's exclusive rights to distribute DirecTV services and the importance of those rights to the business of Pegasus. In Management's Discussion and Analysis of Financial Condition and Results of Operation, Pegasus stated that "as a distributor of DirecTV, we may be adversely affected by any material adverse changes in the assets, financial condition, programming, technological capabilities or services of DirecTV, Inc." The risk factor section of Pegasus' Form 10-Ks also identified several adverse business risks related to PSC's exclusive distribution of DirecTV programming which were contingent upon the operation of DirecTV and beyond the control of PSC. Such risks included potential equipment failure by DirecTV, potential delays to DirecTV in the launching of the satellites, potential failure by DirecTV to provide key PSC markets with local programming, and potentially unpopular programming. The Pegasus Form 10-Ks and 10-Qs, however, failed to disclose the more fundamental risk that PSC could lose all of its exclusivity rights in distributing DirecTV programming without its authorization and consent by an agreement between NRTC and DirecTV. In short, defendants failed to disclose that PSC's entire business plan was vulnerable to termination without cause by another party.

62.   Pegasus' Form 10-Ks purported to disclose the circumstances concerning the potential termination of distribution rights.  According to the disclosure, termination of distribution rights would occur "when the DirecTV satellites were removed from their orbital location at the end of their lives." Further, the Form 10-Ks disclosed that termination could occur earlier for cause if DirecTV, NRTC or PSC breached the relevant distribution agreements. The Pegasus Form 10-Ks, however, failed to disclose other, much more material circumstances regarding termination of PSC's distribution rights. Specifically, the 10-Ks failed to disclose that PSC's distribution

23

rights could be terminated without cause and without its authorization or consent before DirecTV satellites were removed from their orbital location or before the end of the satellites useful lives.

63.     The Pegasus Form 10-Ks and 10-Qs during the Class Period disclosed litigation pending between the NRTC and DirecTV and between PSC and DirecTV regarding the duration of the DBS distribution agreement. According to the disclosure, DirecTV advocated limiting exclusive distribution rights to as short a duration as possible. DirecTV contended in the litigation that the DBS distribution agreement would expire when the useful life of the existing satellite carrying the DirecTV signal expired.  PSC and NRTC contended that the duration of the DBS agreement was extended beyond the useful life of the existing satellite to include the useful life of additional satellites operating in the same orbital location.  Pegasus never disclosed to investors that the useful life of the DBS-1 Satellite did not extend beyond 2007 or 2009 at the latest.  It was not until the 2003 Form 10-K filed on March 15, 2004 that Pegasus stated that the DBS-1 Satellite had an estimated useful life that would end not earlier than 2007 or 2009. In any event, the 2003 Form 10-K disclosed that a settlement was reached between DirecTV and NRTC extending the termination date of the DBS distribution agreement to at least June 30, 2008 and, at the election of a member, providing an extension of distribution rights to June 30, 2011. (PSC was not a party to the settlement). The 2003 Form 10-K failed to disclose any circumstances under which the DBS distribution agreement could be terminated prior to initial term for reasons other than cause arising from a breach by one of the parties.

64.     PSC filed its 2003 Form 10-Ks and 10-Qs on approximately the same dates as the Pegasus Form 10-Ks and 10-Qs during the Class Period. The PSC SEC filings contained substantially the same representations concerning its exclusive rights under the DBS Distribution Agreement and the litigation with DirecTV as more fully set forth in the preceding paragraphs above.

**The Exclusive Distribution Rights Are Terminated With Devastating Consequences to PSC**

65.     Although Pegasus' and PSC's Form 10-Ks and Form 10-Qs and other publications during the Class Period disclosed the fact that PSC was the largest member of NRTC, the disclosures failed to state that PSC lacked control over the business affairs of NRTC and specifically over any decisions by NRTC to terminate the DBS exclusive distribution agreement without PSC's authorization and consent. As such, Pegasus' and PSC's filings and related publications failed to disclose a fundamental risk to their business plan. Certainly this business risk was obvious to Pegasus and more fundamental to its business than other risks disclosed by Pegasus and PSC in their Form 10-Ks and other published materials.

66.     On June 2, 2004, PSC received notice from the NRTC terminating PSC's exclusive distribution agreements with NRTC. The notice stated that the termination was due to an agreement between NRTC and DirecTV to terminate the DBS Agreement. On the same day, Pegasus filed a Form 8-K in which it disclosed the termination.

67.     The loss of exclusivity was devastating to PSC. On the very next day, June 2, 2004, Pegasus announced that PSC, and several other Pegasus affiliates, had filed a voluntary petition for protection under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court, District of Maine. The immediacy of the Chapter 11 filing shows the critical importance of the DirecTV exclusive distribution rights to PSC's welfare.

## DEFENDANTS ACTED WITH SCIENTER

68.     Each of the Defendants had full knowledge that the exclusivity rights to distribute DirecTV could at any time be subject to termination without cause during the initial term of the DBS agreement. Each was familiar with the DBS Distribution Agreements material terms and each was involved and knowledgeable concerning the dispute with DirecTV. Furthermore, the defendants knowingly failed to report that such rights were subject to termination without cause in their quarterly and annual SEC filings during the Class Period.

## PROOF OF PLAINTIFF'S RELIANCE

69.     Plaintiff and members of the Class reasonably relied on the misleading statements set forth above in purchasing Pegasus Stock during the Class Period.

70.     Plaintiff intend to employ two separate and alternative presumptions of reliance in demonstrating that Plaintiff has reasonably relied on the misleading SEC filings and press releases in purchasing shares of Pegasus stock during the Class Period.

### Applicability Of Affiliated Ute Presumption Of Reliance

71.     Neither Plaintiff nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128; 92 S. Ct. 1456; 31 L. Ed. 2d 741; 1972 U.S. LEXIS 163; Fed. Sec. (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This complaint is based primarily on defendants' non-disclosure of the material fact that Pegasus faced the risk that it could have its distribution rights for DirecTV terminated at any time and without cause prior to the end of the initial term of the agreement.

## Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

72.     In the alternative, Plaintiff will rely, in part, upon the presumption of reliance established

by the fraud-on-the-market doctrine in that:

       a.  Defendants made misleading public statements or failed to disclose material

          facts during the Class Period;

       b.  the omissions and misleading statements were material;

       c.  the securities of the Company traded in an efficient market;

       d.  the misleading statements and omissions alleged would tend to induce a

          reasonable investor to misjudge the value of the Company's securities; and

       e.  Plaintiff and members of the Class purchased their Pegasus securities between

          the time defendants failed to disclose or misrepresented material facts and the

          time the true facts were disclosed, without knowledge of the omitted facts or

          misleading statements.

73.     At all relevant times, the market for Pegasus' securities was an efficient market for the

following reasons, among others:

      (a) Pegasus' stock met the requirements for listing, and was listed and actively traded

         on the NASDAQ, an efficient and automated market.  During the class period on

         average approximately five hundred thousand shares of Pegasus stock were traded

         on a weekly basis (after discounting volume by 50% for double counting of market

         maker trades).  The discounted average weekly volume as a percentage of

         outstanding shares exceeded 8.0% permitting a very strong presumption that

         Pegasus shares were traded in an efficient market.

(b) As a regulated issuer, Pegasus filed periodic public reports with the SEC and the NASDAQ and/or NASD;

(c) Pegasus regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Pegasus' stock price reacted quickly in response to material news about the Company;

(e) During the Class Period, Pegasus was eligible to file registration statements on Form S-3 with the SEC;

(f) Several well-known third party stock analysts issued reports on the Company during the Class Period; and

(G) More than fifteen firms acted as market makers in Pegasus stock during the Class Period.

74.     As a result of the foregoing, the market for Pegasus' securities promptly digested current information regarding Pegasus from all publicly available sources and reflected such information in Pegasus's stock price. Under these circumstances, all purchasers of Pegasus's securities during the Class Period suffered similar injury through their purchase of Pegasus's securities at artificially inflated prices and a presumption of reliance applies.

## NO STATUTORY SAFE HARBOR

75.     The statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this complaint, because

28

none of the statements pleaded herein was identified as "forward-looking" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the statements accompany those statements. To the extent that the statutory safe harbor does apply to any statements pleaded herein and those statements are deemed to be forward-looking, Defendants are liable for those false forward-looking statements, because at the time each of those statements were made the speaker actually knew the forward-looking statement was false and/or the statement was authorized and/or approved by an executive officer of the Company, who actually knew that those statements were false when made.

## DEFENDANTS' CONDUCT CAUSED DAMAGE TO INVESTORS

76.     Plaintiff and the members of the Class paid an inflated price for the Pegasus shares the purchased during the Class Period because the market price of the stock was artificially inflated during the Class Period as a result of the above-described misleading statements and omissions, causing Plaintiff and the Class to suffer damages in an amount to be proved at trial.

77.     On February 5, 2004, when DirecTV suggested in a press release that Pegasus' exclusive distribution rights for DirecTV could be terminated prior to 2008, Pegasus stock immediately and substantially declined in value almost 33%.

78.     Then on May 13, 2004, DirecTV issued a press release announcing that U.S. District Court had ruled that DirecTV had the right to terminate the DBS Distribution Agreement prior to the end of the useful life of the DBS-1 Satellite, without Pegasus' consent.  As a result of this fact which Pegasus had concealed, Pegasus' stock dropped 27% and continued to fall further over the next few days.

79.     On June 2, 200, when Pegasus disclosed that DirecTV had unilaterally terminated

Pegasus' exclusive distribution rights and that PSC had filed for bankruptcy, Pegasus stock declined another 4.7% as a result.

## COUNT I
### AGAINST ALL DEFENDANTS FOR VIOLATION OF
### SECTION 10(B) OF THE EXCHANGE ACT AND
### RULE 10B-5 OF THE SECURITIES AND EXCHANGE COMMISSION

80.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     This Count is asserted against Defendant Pegasus, and the Individual Defendants and is based upon Section 10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

82.     During the Class Period, Defendants Pegasus and the Individual Defendants, singly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the Class.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the Class to purchase Pegasus common stock during the Class Period at artificially inflated prices.

83.     Throughout the Class Period, Pegasus acted through the Individual Defendants, the Company's officers and directors.  The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to Pegasus, rendering the Company primarily liable for the securities law violations of these Defendants committed while performing in their official

capacity as Company representatives.  In the alternative and additionally, Pegasus is liable for the acts of the Individual Defendants under the doctrine of respondent superior.

84.     Each of the Defendants had an affirmative duty to correct all of the above described false information concerning the DBS agreement that.  Defendants' failure to correct the false information when Defendants were aware of the falsity of such information was a conscious violation of the securities laws.

85.     As a result of the failure to disclose material facts, the information that defendant Pegasus and the Individual Defendants disseminated to the investing public was materially misleading as set forth above, and the market price of Pegasus common stock was artificially inflated during the Class Period.  Plaintiff and the Class relied on the above-described misleading statements in purchasing and/or retaining Pegasus shares during the Class Period.  In ignorance of the misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, Plaintiff and the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing Pegasus common stock.  Had Plaintiff and the Class known the truth, they would not have purchased said shares.

86.     Plaintiff and the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

87.     By reason of the foregoing, defendants Pegasus and the Individual Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of Pegasus common stock during the Class Period.

88.     This action is being brought within two years after the discovery of the untrue statements

and omissions and within five years after their issuance.

**COUNT II**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR**
**VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT**

89.     Plaintiff repeats and re-alleges each and every allegation contained in each of the

foregoing paragraphs as if set forth fully herein.

90.     Each of the Individual Defendants, by virtue of their management positions,

directorships, stock ownership and/or specific acts described above, were, at the time of the

wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the 1934 Act.

91.     The Individual Defendants had the power and influence and exercised the same to cause

Pegasus to engage in the illegal conduct and practices complained of herein.

92.     By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants

are liable for the aforesaid wrongful conduct, and are liable to Plaintiff and the Class for the

substantial damages which they suffered in connection with their purchases of Pegasus common

stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and the Class, prays for judgment as follows:

a.     Declaring this action to be a proper plaintiff class action maintainable pursuant to Rules

23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaring plaintiffs to be proper

representatives of the Class and their counsel to be appropriate lead counsel for the Class;

b.     Awarding Plaintiff and the members of the Class damages together with interest thereon;

c.     Awarding Plaintiff and the members of the Class their costs and expenses in this

litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d.    Awarding Plaintiff and the members of the Class such other and further relief as may be just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial by jury of all issues.

DATED: November 8, 2005        JACOB A. GOLDBERG, ESQ. LLC

//s/   JAG3869
Jacob A. Goldberg, Esq. (PA Bar No. 66399)
P.O. Box 30132
Elkins Park, PA  19027
Tel:  (215) 782-8235
Fax: (215) 782-8236
Email: jacobagoldberg@comcast.net

THE ROSEN LAW FIRM, P.A.
Laurence Rosen, Esq.
350 Fifth Avenue, Suite 5508
New York, NY  10118
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com

***Counsel for Plaintiff Mark Madden and the Class***

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Pegasus Communications Corporation ("Pegasus"), its current and former officers and directors and affiliated parties. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed the complaint against Pegasus and certain of its officers and directors and affiliated parties and authorized the filing thereof by the Rosen Law Firm, P.A., whom I retain as counsel in this action for all purposes.

2.     I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.     I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.     The following is a list of all of the purchases and sales I have made in Pegasus common stock. I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 85 | 11/05/2001 | $9.21 | 09-19-2005 | $ 3.25 |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

*[handwritten note:]* 18 shares sold which is equivalent if 85 shares on 11/5/01 due to reverse stock splits

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM:  (212) 202-3827

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___1ˢᵗ___ day of
N̲o̲v̲e̲m̲b̲e̲r̲___, 2005.



Signature: _____

Name:  Mark Madden
Address:  201 River Street, Apt 31
          Troy, NY 12180
Phone:  (518) 788-4098
E-mail: markus678@yahoo.com


Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR MAIL TO:
THE ROSEN LAW FIRM PA
350 FIFTH AVENUE, SUITE 5508
NEW YORK, NY  10118